MERCHANDISE NATIONAL BANK OF CHICAGO, Plaintiff and Counterdefendant-Appellant, *v.* JOSEPH R. SCANLON, Defendant and Counterplaintiff-Appellee.

First District (2nd Division)   No. 78-1959

Opinion filed July 8, 1980.

Robert Handelsman and Howard D. Hollander, both of Chicago, for appellant.

William P. Wilen and James O. Latturner, both of Legal Assistance Foundation, of Chicago, for appellee.

Mr. PRESIDING JUSTICE PERLIN delivered the opinion of the court:

Plaintiff, Merchanidse National Bank of Chicago (hereinafter referred to as the Bank), obtained a judgment by confession on a collateral installment note against defendant, Joseph R. Scanlon, in the amount of a deficiency balance after a sale of collateral. On proceedings to confirm the judgment, defendant filed an answer and a counterclaim alleging violations of article 9 of the Uniform Commercial Code as adopted in Illinois (Ill. Rev. Stat. 1975, ch. 26, par. 9—101 *et seq.*), of the Illinois Interest Act (Ill. Rev. Stat. 1975, ch. 74, par. 1 *et seq.*), and of the Federal Consumer Credit Protection Act, popularly known as Truth in Lending Act (15 U.S.C. §1601 *et seq.* (1970) and Regulation Z[1] (12 C.F.R. par. 226.1 *et seq.* (1973)). Pursuant to a trial on the merits, the circuit court vacated the judgment by confession against Scanlon and entered

[1] The Board of Governors of the Federal Reserve System is directed to prescribe regulations to execute and implement the purposes of the Truth in Lending Act (15 U.S.C. §1604 (1970)). In compliance with this statutory directive the Board has promulgated Regulation Z.

judgment against the Bank on the counterclaim. The trial court also awarded attorney's fees to Scanlon's attorney, the Legal Assistance Foundation of Chicago. The Bank appeals, presenting the following issues for review: (1) whether the remedies afforded in the instant case by the Illinois Commercial Code, the Illinois Interest Act, the Truth in Lending Act and Regulation Z are duplicative or cumulative; and (2) whether the trial court's award of attorney's fees was an abuse of its discretion.

For reasons hereinafter set forth, we affirm.

On February 8, 1977, Scanlon executed a collateral installment note in the principal amount of $753.99[2] plus a finance charge of $58.53. The total amount of $812.52 was to be payable to the Bank in 12 successive monthly installments of $67.71. Pursuant to the terms of the agreement, the Bank acquired a security interest in a 1971 Ford Country Squire (hereinafter referred to as the automobile). After Scanlon defaulted in making payments, the Bank repossessed the automobile on or about April 27, 1977. On May 2, 1977, the Bank sent to Scanlon a "Notice of Intent to Debtor" which indicated that the Bank intended to apply to the Secretary of State to transfer the title of the automobile from Scanlon to the Bank. The "Notice of Intent to Debtor" was returned, "unclaimed," to the Bank on or about May 14, 1977.[3] The automobile was sold on or about September 26, 1977.[4]

On December 19, 1977, the Bank filed a complaint for confession of judgment against Scanlon in the amount of the principal due under the note ($729.33) plus attorney's fee ($104.50) for a total of $833.83.[5] Attached to the complaint was a copy of the collateral installment note executed by Scanlon. On December 20, 1977, the court entered a confession of judgment in the amount of $833.83 against Scanlon and a summons to confirm the judgment was issued to Scanlon.

Scanlon filed an answer, affirmative defense and counterclaim on February 2, 1978. In count I of his counterclaim Scanlon alleged that the Bank had violated section 9—504(3) of the Uniform Commercial Code (Ill. Rev. Stat. 1975, ch. 26, par. 9—504(3)) by failing to provide Scanlon with reasonable notification of the sale of the automobile, and by failing

---

[2] This amount includes the credit life insurance at the cost of $3.99.

[3] The "Notice of Intent to Debtor" was sent to Scanlon's last known address by certified mail. The Bank's reply memorandum in lieu of closing argument indicated that Scanlon had testified that the "Notice of Intent to Debtor" had been correctly addressed but that he had failed to claim it at his post office.

[4] The record does not indicate what, if anything, transpired between May 14, 1977, and September 26, 1977. The pleadings indicate that the automobile was sold for $250 even though its retail book value was $1,450 and its wholesale book value was $975.

[5] We note that the Bank's complaint for confession of judgment against Scanlon did not include credit for the proceeds from the sale of the automobile.

to sell the automobile in a commercially reasonable manner. He further alleged that section 9—507(1) of the Uniform Commercial Code (Ill. Rev. Stat. 1975, ch. 26, par. 9—507(1)) entitled him to recover "not less than the credit service charge, plus 10% of the principal amount of the debt or the time price differential plus 10% of the cash price." In count II of his counterclaim Scanlon alleged that the Bank had violated the provisions of the Truth in Lending Act and Regulation Z (15 U.S.C. §§1631 and 1639(a) (1970) and 12 C.F.R. §§226.6(a) and 226.8(b)(5) (1973)) by failing to clearly, conspicuously, and in a meaningful sequence describe and identify the type of security interests held, retained or acquired by the Bank in connection with the extension of credit. He further alleged that 15 U.S.C. §1640(a) (1970) entitled him to recover twice the amount of the finance charge imposed on the installment note, court costs and reasonable attorney's fees.[6] In count III of his counterclaim Scanlon alleged that the Bank had failed to comply with section 4a(g)(i) of the Illinois Interest Act (Ill. Rev. Stat. 1975, ch. 74, par. 4a(g)(i)) because the installment note failed to contain, on both sides of the document, the statement: "NOTICE: See other side for important information." Scanlon also alleged that the Bank violated section 4a(c) (Ill. Rev. Stat. 1975, ch. 74, par. 4a(c)) by failing to deliver to him a copy of the credit life insurance policy for which he had paid, or otherwise comply with section 155.56 of the Illinois Insurance Code (Ill. Rev. Stat. 1975, ch. 73, par. 767.56). He further alleged that section 6 of the Illinois Interest Act (Ill. Rev. Stat. 1975, ch. 74, par. 6) entitled him to recover "twice the total of all interest, discount and charges determined by the loan contract or paid by the obligor, whichever is greater, plus such reasonable attorney's fees and court costs as may be assessed by a court against the lender."

On October 31, 1978, the trial court entered an order granting Scanlon's motion for directed verdict against the Bank on the Bank's complaint. In addition, the trial court found that Scanlon had proved all three counts of his counterclaim and entered judgment in the amount of $133.53 on count I, $117.06 on count II and $117.06 on count III. The trial court also entered judgment in the amount of $3,625 on Scanlon's claim for attorney's fees pursuant to counts II and III of his counterclaim. Scanlon was directed to pay said sum to the Legal Assistance Foundation of Chicago.

## I.

■■ The Bank initially contends that there can be only one satisfaction for an injury, irrespective of the availability of multiple remedies and

---

[6] 15 U.S.C. §1640 (1970) provides that the liability for twice the amount of the finance charge shall not be less than $100 nor greater than $1,000.

actions.[7] The general proposition that there can be only one satisfaction for an injury is not disputed. However, in the case at bar Scanlon has suffered three separate and distinct injuries which will be discussed in detail below.

## A.

In count I of his counterclaim Scanlon alleged that the Bank had violated section 9—504(3) of the Uniform Commercial Code by failing to provide him with "reasonable notification" of the sale of the automobile, and by failing to sell the automobile in a "commercially reasonable" manner. The Bank does not contend that the evidence presented at trial was insufficient to support the trial court's finding that the Bank had violated the rights conferred upon Scanlon by this section. It is for these violations that Scanlon has, pursuant to section 9—507 "*a right to recover in any event an amount* not less than the credit service charge plus 10% of the principal amount of the debt or the time price differential." (Emphasis added.) This recovery provision, with its minimum limit, leaves no doubt that it was intended not as a means of compensating the debtor but rather to impose a civil penalty upon the lender. This interpretation is further reinforced by the fact that section 9—507 confers upon the debtor a right to recover from the lender any actual loss caused by a failure to comply with the provisions of section 9—504(3). The purpose of imposing such civil liability upon creditors is to force compliance with the protective provisions of section 9—504(3). To deny Scanlon his "right to recover" would be to undercut the effectiveness of the act without apparently furthering other policies.

## B.

In count II of his counterclaim Scanlon alleged that the Bank had violated the provisions of the Truth in Lending Act and Regulation Z (15 U.S.C. §§1631 and 1639(a) (1970) and 12 C.F.R. §§226.6(a) and 226.8(b)(5) (1973)) by failing to "clearly, conspicuously" and "in a meaningful sequence" describe and identify the type of security interests held, retained or acquired by the Bank. The Bank does not contend that

---

[7] The Bank argues that "[a]ll of the incidents complained of in the counterclaim constitute one 'transaction' " and thereby only one injury. As authority for this proposition of law, the Bank directs our attention to *Moore v. New York Cotton Exchange* (1926), 270 U.S. 593, 609, 70 L. Ed. 750, 757, 46 S. Ct. 367. In that case the Supreme Court held that the Federal rules of civil procedure provided for two classes of counterclaims: "(a) One 'arising out of the transaction which is the subject matter of the suit,' and (b) another 'which might be the subject of an independent suit in equity' ° ° °." The "transaction" analysis has been applied to determine whether a court has jurisdiction (the power to decide a justiciable controversy) over counterclaims. It cannot be reasoned therefrom that in the case at bar only one injury occurred.

the evidence presented at trial was insufficient to support the trial court's finding that the Bank had violated these provisions of the Truth in Lending Act and Regulation Z. It is for this violation that the Bank is liable to Scanlon pursuant to 15 U.S.C. §1640 (1970) for "any actual damage sustained" by Scanlon, "twice the amount of [the] finance charge," court costs and reasonable attorney's fees.

The purpose of the Truth in Lending Act is to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and thus avoid the uninformed use of credit. (15 U.S.C. §1601 (1970).) The scheme of the statute is to create a system of private attorneys general to aid its enforcement (*McGowan v. King, Inc.* (5th Cir. 1978), 569 F.2d 845, 848) by conferring on the consumer a private cause of action. "The basis of §1640(a) liability is the failure to disclose information required to be disclosed; there is no requirement that the plaintiff be deceived, in order *to sue in the public interest.*" (Emphasis added.) (*McGowan v. King, Inc.,* at 849.) Moreover, section 1640 is not "a remedy for breach of contract, designed to give the nonbreaching party the benefit of his bargain. The damage provision, providing minimum and maximum limits, is inconsistent with such a thesis. Rather, section 1640 provides a 'civil penalty.' *Mourning v. Family Publications Service, Inc.* (1973), 411 U.S. 356, 376, 36 L. Ed. 2d 318, 333-34, 93 S. Ct. 1652, 1664. Accord, *Eby v. Reb Realty, Inc.* [(9th Cir. 1974), 495 F.2d 646.]" (*Sellers v. Wollman* (5th Cir. 1975), 510 F.2d 119, 122.) That the recovery provision imposes a civil penalty rather than compensating the consumer is also apparent from the fact that the amount recoverable, in addition to actual damages, is not the credit service charge itself but "twice the amount of the finance charge in connection with the transaction." To deny Scanlon recovery under section 1640 would be to emasculate the proscriptions of the Truth in Lending Act without apparently furthering other policies.

### C.

In count III of his counterclaim Scanlon alleged that the Bank violated section 4a(c) of the Illinois Interest Act by failing to deliver to him a copy of the credit life insurance policy for which he had paid, or otherwise comply with section 155.56 of the Illinois Insurance Code (Ill. Rev. Stat. 1975, ch. 73, par. 767.56). Scanlon also alleged that the Bank violated section 4a(g) of the Illinois Interest Act because the collateral installment note failed to contain, on both sides, the statement: "NOTICE: See other side for important information." The Bank does not contend that the evidence presented at trial was insufficient to support the trial court's finding that the Bank had violated these provisions of the Illinois Interest Act. It is for these violations that Scanlon may,

pursuant to section 6 of the Illinois Interest Act, "recover an amount equal to twice the total of all interest, discount and charges determined by the loan contract or paid by the obligor, whichever is greater, plus such reasonable attorney's fees and court costs as may be assessed by a court against the lender." The provision for "twice the total of all interest" leaves no doubt that it was intended not as a means of compensating the debtor but rather to impose a civil penalty upon the lender. The purpose of imposing such civil liability upon creditors is to assure compliance with the protective provisions of the Interest Act. To deny Scanlon recovery pursuant to section 6 would be to sanction unscrupulous practices by creditors without apparently furthering other policies.

## D.

The Bank directs our attention to *Ninth Liberty Loan Corp. v. Hardy* (1977), 53 Ill. App. 3d 601, 368 N.E.2d 971, in support of its contention that "there may be only one satisfaction for an injury, irrespective of the availability of multiple remedies and actions." We find *Ninth Liberty Loan Corp. v. Hardy* distinguishable from the case at bar. Plaintiff, Ninth Liberty Loan Corporation, brought suit against defendant, Hardy, to recover the balance allegedly due on a promissory note given as payment on a personal loan. Hardy filed "two counterclaims." The "first counterclaim" alleged that Liberty Loan had failed to disclose "[a] description or identification of the type of any security interest held or to be retained or acquired" by the lender, in violation of section 14 of the Consumer Finance Act (Ill. Rev. Stat. 1969, ch. 74, par. 32). The penalty imposed for failure to comply with section 14 is contained in section 19 (Ill. Rev. Stat. 1969, ch. 74, par. 37), which provides that the lender shall have no right to collect or receive any principal, interest or charges on the loan. Hardy's "second counterclaim" alleged that Liberty Loan failed to disclose "a description of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit, and a clear identification of the property to which the security interest relates," in violation of 15 U.S.C. §1639(a)(8) (1970). The penalty imposed for failure to comply with section 1639(a)(8) is twice the amount of the finance charge. (15 U.S.C. §1640(a) (1970).) The appellate court at page 607 held: "[W]e regard the remedies afforded by the two Acts as duplicitous, not cumulative."

In *Ninth Liberty Loan Corp. v. Hardy* there was only one injury suffered by Hardy, Liberty Loan's failure to disclose a description or identification of the security interest it held, retained or acquired, irrespective of the availability of the multiple remedies and action. In the case at bar there were three distinct and different injuries suffered by

Scanlon. Thus, the rule of *Ninth Liberty Loan Corp. v. Hardy* is inapplicable to the case at bar.[8] To force an election by Scanlon between the remedies is to force an election by him between the injuries he suffered. (*Public Finance Corp. v. Riddle* (1980), 83 Ill. App. 3d 417, 403 N.E.2d 1316.) Such a result is not consistent with basic notions of due process. In addition, such an election would in our opinion undercut the effectiveness of the several acts. The purpose of imposing civil penalties is to compel compliance with the provisions of those acts. Without the imposition of the penalties provided for under each act, the sanction against prohibited practices is weakened. These economic penalties provide the incentive for compliance with the several acts. Unless creditors are penalized for each and every right which they violate, the incentive for compliance is greatly diminished. It cannot then be logically said that the remedies afforded in the instant case are duplicitous. We conclude, therefore, that the trial court did not err in entering judgment in favor of Scanlon on all three counts of his counterclaim.

## II.

The Bank also contends that the trial court's award of attorneys' fees in the amount of $3,625 was an abuse of its discretion. Scanlon is entitled to recover "reasonable attorney's fees" pursuant to both the Truth in Lending Act (15 U.S.C. §1640 (1970)) and the Illinois Interest Act (Ill. Rev. Stat. 1975, ch. 74, par. 6). After an evidentiary hearing, the trial court determined that reasonable fees in the amount of $3,625 were warranted based upon the following computation: Mr. Latturner, deputy director of the Legal Assistance Foundation, three hours at $75 per hour; Mr. Wilen, supervising attorney, uptown office, 35 hours at $60 per hour; and Mr. Kosoff, senior law student, 52 hours at $25 per hour. In arriving at its determination the trial court expressly found that these rates were fair and reasonable, and consistent with the rates prevalent in the practice of law for attorneys with comparable experience and expertise. With respect to Mr. Kosoff, the court computed the value of his services based upon the recognized value of services rendered by paralegals or law clerks.

## A.

■ We first consider whether the cost of providing for the services of Mr. Kosoff, a certified senior law student (58 Ill. 2d Rule 711), is an overhead cost as any other employee cost, defrayed by attorneys out of the proceeds from their fees and hence not separately reimbursable. Unlike

---

[8] In his memorandum of supplemental authority Scanlon suggests that the recent amendment to section 19 of the Consumer Finance Act (Ill. Rev. Stat. ch. 74, par. 37) is a "legislative rejection of the holding and reasoning" of *Ninth Liberty Loan Corp. v. Hardy*. Because Scanlon does not seek relief pursuant to the Consumer Finance Act, and because the rule of *Ninth Liberty Loan Corp. v. Hardy* is inapplicable to the case at bar, we do not consider whether the recent amendment does in fact constitute such a "legislative rejection."

the work of secretaries and other supporting personnel, the work of senior law students is, in many instances, work of a kind necessary to the prosecution of the litigation which will, or ought to be performed, if not by them, by attorneys. (See Supreme Court Rule 711; and also *Chapman v. Pacific Telephone & Telegraph Co.* (N.D. Cal. 1978), 456 Supp. 77, 83.) Although research has revealed no case wherein an attorney's fee award pursuant to section 6 of the Illinois Interest Act was determined in part by services rendered by a senior law student, our supreme court in *Fiorito v. Jones* (1978), 72 Ill. 2d 73, 83, 377 N.E.2d 1019, has indicated that work performed by law clerks may be recompensable.

> "Pursuant to *Leader*, the trial court is not only to inquire into the total hours expended which benefitted the unnamed class members, but also to determine in what manner the time was expended (*e.g.*, court appearance, research, writing, discovery) and by whom (*e.g.*, senior or junior partners, associates or law clerks)."

In *People v. Atkinson* (1977), 50 Ill. App. 3d 860, 867, 366 N.E.2d 94, the court reasoned:

> "Under contemporary circumstances it seems unrealistic to require that work which requires somewhat less expertise and experience must be personally performed by appointed counsel in order to be compensated. It would appear that certain delegated work in a case, always remaining the responsibility of appointed counsel and done under his supervision, when found to be economic and necessary should be compensated in some manner."

Thus we conclude that the services performed by Mr. Kosoff are separately recompensable to the Legal Assistance Foundation pursuant to section 6 of the Illinois Interest Act.

The majority of federal courts have rejected the notion that the cost of providing paralegal-law clerk services should be treated as non-reimbursable overhead expense.[9] (See, *e.g.*, *Chapman v. Pacific Telephone & Telegraph Co.*) There is, however, some authority to the contrary. (See, *e.g.*, *CTS Corp. v. Electro Materials Corp. of America* (S.D. N.Y. 1979), 476 F. Supp. 144.) In our opinion the services rendered by Mr. Kosoff are recompensable to the Legal Assistance Foundation pursuant to the Truth in Lending Act, 15 U.S.C. §1640 (1970).

---

[9] Two alternative methods for recompensing these services have been employed. They may be treated as costs or as attorneys' fees. A number of courts have allowed charges for paralegal-law clerk services to be taxed as costs in antitrust cases. (See, *e.g.*, *Computer Statistics, Inc. v. Blair* (S.D. Tex. 1976), 418 F. Supp. 1339, 1352.) The ninth circuit has rejected treating these services as costs, but has accepted the propriety of awarding charges for paralegal-law clerk services as part of attorneys' fees. See, *e.g.*, *Pacific Coast Agricultural Export Association v. Sunkist Growers, Inc.* (9th Cir. 1975), 526 F.2d 1196, 1210, *cert. denied* (1976), 425 U.S. 959, 48 L. Ed. 2d 204, 96 S. Ct. 1741.

For its contention that the services provided by Mr. Kosoff are not separately recompensable the Bank relies primarily upon *Hannon v. Security National Bank* (9th Cir. 1976), 537 F.2d 327, and *Postow v. Oriental Building Association* (D.D.C. 1978), 455 F. Supp. 781. Both cases are distinguishable from the case at bar. In *Hannon* the plaintiff prosecuted the action *in propria persona*. The question considered by the court was whether the interpretation of section 1640 "should be extended to allow recovery of attorney's fees when no attorney has been retained." In the case at bar, Scanlon retained an attorney, the Legal Assistance Foundation. In *Postow* the court concluded that the "documentation submitted on the lawclerks employed by plaintiff's attorneys is incomplete. It does not indicate the qualifications of these lawclerks or specify the work performed. The Court is therefore unable to discern whether the lawclerks performed services that would have otherwise been performed by the attorneys or whether they performed administrative tasks or general legal research either of which would be more properly included in the attorneys' hourly rates as part of their general overhead costs." (455 F. Supp. 781, 788.) In the case at bar, the qualifications of Mr. Kosoff as well as the tasks performed by him were specified. The services rendered by him were those which "would have otherwise been performed by the attorneys."

## B.

■ The Truth in Lending Act (15 U.S.C. §1640(a)(3) (1970)) requires the court to award "reasonable attorney's fees."[10] The Bank first contends that because Scanlon was under no obligation to pay his attorneys, the Legal Assistance Foundation, an award of attorneys' fees is in error. In *Manning v. Princeton Consumer Discount Co.* (3d Cir. 1976), 533 F.2d 102, 106, *cert. denied* (1976), 429 U.S. 865, 50 L. Ed. 2d 144, 97 S. Ct. 173, a Truth in Lending action, the court held:

> "A creditor who fails to provide any information required to be disclosed to the consumer is liable 'for a reasonable attorney's fee.' 15 U.S.C. §1640(a). The Act does not make the award contingent upon the plaintiff's obligation to pay her attorney or whether a fee in fact was charged. We agree with the Court of Appeals for the Fifth Circuit that, in the absence of express limitation in the Act, a fee may be awarded to a legal services office. [Citation.]"

In *Fairley v. Patterson* (5th Cir. 1974), 493 F.2d 598, 606-07, the court opined "that allowable fees and expenses may not be reduced because appellant's attorney was employed or funded by a civil rights organization and/or tax exempt foundation or because the attorney does not

---

[10] It should be noted that while this section places $1000 limit on damages, its only limit on attorneys' fees is that the fees be reasonable.

exact a fee," and that "[w]hether the attorney charges a fee or has an agreement that the organization that employs him will receive any awarded attorneys' fees are not bases on which to deny or limit attorneys' fees or expenses." In *Torres v. Sachs* (2d Cir. 1976), 538 F.2d 10, the court rejected the argument that fees awarded to publicly financed legal services organizations should be less than the fees received by privately employed counsel for work of comparable importance, extent and complexity. Moreover, the court in *Rodriguez v. Taylor* (3d Cir. 1977), 569 F.2d 1231, 1248, *cert. denied* (1978), 436 U.S. 913, 56 L. Ed. 2d 414, 98 S. Ct. 2254, found that the trial court abused its discretion by emphasizing the factor of absolute salaries paid by the legal services organization in computing an hourly rate of compensation.

■ The trial court has 'broad discretion in awarding attorneys' fees because of the advantage of close observation of the work product of the attorney and an understanding of the skill and time required by the suit. (*Mirabal v. General Motors Acceptance Corp.* (7th Cir. 1978), 576 F.2d 729, 730.) Our review is limited to the determination of whether the trial court abused this discretion. (*Mirabal*, at 730.) Thus a court of review is not justified in disturbing the award simply because it may have made a different award.

■ In determining whether the fees awarded in the case at bar are reasonable within the meaning of section 1640(a), the Bank contends that *Mirabal v. General Motors Acceptance Corp.* is dispositive. In that case the attorney for the prevailing consumers expended 350 hours for which he was awarded fees in the amount of $2000.[11] The consumers' statutory recovery was also $2000. The court of appeals in affirming the award of attorneys' fees opined:

> "The instant case involved a one-time individual claim based mainly on a bona fide arithmetical error. As this court declared in *Sprogis v. United Air Lines, Inc.*, 517 F.2d 387, 391 (7th Cir. 1975), when it balked at the fee request there:
> 'First, this case does not represent the typical * * * claim envisioned by Congress and in the past sponsored by various public interest organizations. Second, the claim for attorneys' fees is not proportionate to the recovery of damages by plaintiff. Third, the precedential value of this decision is not controlling in light of [its reliance on an admitted arithmetical error.]' " 576 F.2d 729, 730.

In our opinion, *Mirabal v. General Motors Acceptance Corp.* is readily distinguishable from the case at bar. The attorney for the prevailing consumers expended 350 hours on a case characterized by the court of appeals as a "one-time individual claim based mainly on a bona

---

[11] The majority opinion as well as the dissenting opinion indicates that General Motors Acceptance Corporation had paid their attorneys more than $30,000 in defending this suit.

fide arithmetical error." The trial court remarked that the expenditure of this many hours was "utterly unnecessary" and awarded fees in the amount of only $2000. While the court of appeals did not disturb this ruling of the trial court, it did not hold that in all Truth and Lending actions attorneys' fees should not exceed the amount of statutory damages imposed. Instead, the court of appeals first noted that " 'this case does not represent the typical * * * claim envisioned by Congress,' " and then held that " 'the precedential value of this decision is not controlling in light of [its reliance on an admitted arithmetical error.]' " In the case at bar Scanlon's attorney expended 90 hours on a case which required nine court appearances, a full trial on the merits and the preparation of two legal memoranda requested by the court. The Truth in Lending violation in the present case involved the Bank's failure to properly disclose the security interest the Bank was to hold, retain or acquire. This violation is precisely the type that Congress intended to be corrected by private actions sued upon in the public interest. *McGowan v. King, Inc.*

The policy of discouraging the filing of questionable claims must be balanced against the policy underlying the Truth in Lending Act itself. The Act embodies the national policy that economic stabilization and competition will be enhanced if consumers are given accurate and meaningful disclosure of credit. (15 U.S.C. 1601 (1970).) Enforcement of this policy was placed primarily on the private sector through suits for civil penalties. A provision for attorney's fees helps assure that enforcement will take place. But such a provision is rendered meaningless unless attorneys for successful parties are given reasonably adequate compensation for their services. The need for adequate compensation is particularly important since the statutory penalty is limited to $1000. If a presumption is imposed that a successful attorney is allowed only the amount recovered by his client, creditors can effectively preclude the filing of all Truth in Lending actions. By refusing to negotiate even reasonable claims and by litigating every case, creditors can soon force a debtor to terminate litigation, not because his claim is invalid but because it is no longer economically feasible for his attorney to continue the case. This case is a prime example. It is not unjustifiable to conclude that few attorneys would prosecute a Truth in Lending action when they learn they may earn only $4.41 per hour.[12]

Several methods for computing reasonable attorneys' fees have been developed by the Federal courts, but two methods predominate. *Johnson v. Georgia Highway Express, Inc.* (5th Cir. 1974), 488 F.2d 714, enumerates 12 factors which a court may consider in determining reasonable attorneys' fees: the time and labor required, the novelty and

---

[12] $369.65 (damages in the case at bar) divided by 90 hours equals $4.41.

difficulty of the questions, the skill requisite to litigate the case, preclusion of other employment, the customary fee charged in the area, the amount involved, the results obtained, the experience, reputation and ability of the attorneys and the awards in similar cases. The courts, however, have not provided much guidance as to how these various factors are to be applied or the weight to be given them. In fact this precise criticism was recently levied against the *Johnson v. Georgia Highway Express* approach in *Northcross v. Board of Education* (6th Cir. 1979), 611 F.2d 624. In rejecting the *Johnson v. Georgia Highway Express* approach, the *Northcross* court at page 642 reasoned:

> "Many courts have used the 'list of factors for consideration' approach first suggested by the Fifth Circuit in its oft-cited decision *Johnson v. Georgia Highway Express, Inc.*, [citation] and relied on by this Court in *Monroe v. County Bd. of Educ.* [citation]. * * * We have learned through experience, however, that merely providing a check list of factors to consider does not lead to consistent results, or in many cases, reasonable fees. Many of the factors are overlapping, and there is no guidance as to the relative importance of each factor, or indeed, how they are to be applied in a given case."

The *Northcross* court instead adopted the analytical or "lodestar computation" developed in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.* (3d Cir. 1973), 487 F.2d 161:

> "We conclude that an analytical approach, grounded in the number of hours expended on the case, will take into account all the relevant factors, and will lead to a reasonable result. The number of hours of work will automatically reflect the 'time and labor involved,' 'the novelty and difficulty of the question,' and 'preclusion of other employment.' The attorney's normal hourly billing rate will reflect 'the skill requisite to perform the legal service properly,' 'the customary fee,' and the 'experience, reputation and ability of the attorney.' Adjustments upward may be made to reflect the contingency of the fee, unusual time limitations and the 'undesirability' of the case. Thus, applying the approach used in this decision will result in an award reflecting those considerations traditionally looked to in making fee awards, but will also provide a logical, analytical framework which should largely eliminate arbitrary awards based solely on a judge's predispositions or instincts." *Northcross*, at 642-43.

In the case at bar, the trial court was well advised through testimony and affidavits of both the time expended and the work performed by the attorneys and Mr. Kosoff. The testimony of each of the attorneys and

Mr. Kosoff amply demonstrates their experience and ability. In our opinion the analysis by the court encompassed the foregoing considerations and was well within the bounds of the trial court's discretion.

## C.

Section 6 of the Illinois Interest Act authorizes the recovery of "reasonble attorney's fees." In *Flynn v. Kucharski* (1974), 59 Ill. 2d 61, 67, 319 N.E.2d 1, our supreme court rejected the theory that fees for successful plaintiffs' attorneys should be based on the amount recovered. Instead, the court reasoned that "a highly significant factor in determining the fee" is the time expended on the case. In *Leader v. Cullerton* (1976), 62 Ill. 2d 483, 488, 343 N.E.2d 897, the court concluded that the amount of time expended by the attorneys should "be considered as the starting point or the basis upon which the fees are computed depending upon the circumstances." In fixing the hourly rate the court held that consideration should be given to the "skill and qualification of the attorneys" and the complexity of the case. The court also cautioned that the "hourly rate should be commensurate with the undertaking and should not be so low as to discourage participation in such cases by highly qualified counsel." (*Leader*, at 492.) In *Fiorito v. Jones* (1978), 72 Ill. 2d 73, 377 N.E.2d 1019, the court at pages 89-90 opined:

"Pursuant to *Leader*, the trial court is not only to inquire into the total hours expended which benefited the unnamed class members, but also to determine in what manner the time was expended (*e.g.*, court appearance, research, writing, discovery) and by whom (*e.g.*, senior or junior partners, associates or law clerks). * * * The court is obliged, also, to carefully weigh, according to its own knowledge, experience and expertise, whether the hours claimed and the tasks performed are reasonable in relationship to the time required by other attorneys to complete similar activities. In the event the court finds the hours claimed are the result of unnecessary, duplicative work efforts or inefficiency, it must reduce the excessive hours claimed. *Leader v. Cullerton* (1976), 62 Ill. 2d 483, 490-91; *Johnson v. Georgia Highway Express, Inc.* (5th Cir. 1974), 488 F.2d 714, 717; *In re Penn Central Securities Litigation* (E.D. Pa. 1976), 416 F. Supp. 907, 916-17.

When the court has determined the number of hours which benefit the class, it must then value the services by fixing a reasonable hourly rate for each attorney, taking into account the nature of the services performed, the complexity of the undertaking and the hourly fee charged for similar services by attorneys with similar skills and qualifications. (*Leader v. Cullerton* (1976),

62 Ill. 2d 483, 491-92.) The court may award hourly rates that differ according to the categories of services performed. (*Lindy I* (3d Cir. 1973), 487 F.2d 161, 167; *Johnson v. Georgia Highway Express, Inc.* (5th Cir. 1974), 488 F.2d 714, 717; *Liebman v. J. W. Petersen Coal & Oil Co.* (N.D. Ill. 1974), 63 F.R.D. 684, 691.) The appropriate hourly rates are then multiplied by the hours expended. The product of this multiplication is referred to as the "lodestar" computation. *Lindy I* (3d Cir. 1973), 487 F.2d 161, 168." In our opinion the analysis of the trial court in the case at bar was well within the bounds of its discretion as established by our supreme court in *Flynn, Leader* and *Fiorito*.

Based upon the foregoing we affirm the judgment of the circuit court of Cook County.

Affirmed.

STAMOS and HARTMAN, JJ., concur.